Good morning, Your Honors. Stephen Eisenberg on behalf of Appellant Fresh Mix. With regard to time, Your Honor, I would like to try to reserve five minutes in rebuttal. Sorry, sorry, Your Honor. To the extent I can reserve about five minutes for rebuttal. See how that goes. Your Honors, this is an interesting and complicated case when you look at it as a whole, but when you peel back the papers, it's rather a very simple case that I think the District Court got muddled in the complexities. So we have three different proceedings, Your Honor. Your Honors, we have an arbitration, we have a state court case, and we have a bankruptcy proceeding. So the defendants, the vast majority of them, represented Fresh Mix as well as other entities. The potential malpractice claims apply to all So, no, Your Honors, and that's one of the complexities. The malpractice case applies to the bankruptcy proceedings. And so you have these two prior proceedings in which these attorneys, a group of these attorneys, represented Fresh Mix as well as others. You then have a bankruptcy proceeding, Your Honors, and it's very simple boiling down. Look at the bankruptcy proceeding. Who's the creditor? Get Fresh. Who is the debtor? Fresh Mix. Now we get this complication that the other side and the District Court got caught in. Who are Mr. Ligutti and Ponder? Well, in the bankruptcy, Mr. Ligutti and Ponder are the equity holders of Fresh Mix. In fact, they fight... They're not the only equity holders of Fresh Mix. Get Fresh was a creditor in that bankruptcy, Your Honor. Well, yes, but they also, as a matter of fact, were equity holders. Yes, but how did they behave in the bankruptcy, Your Honors? They were a creditor. Before the settlement, Ligutti and Ponder were minority owners who did not have the right to bring the legal malpractice claims at issue. After the settlement, they purported to have the right to bring the claims, but Nevada law prohibits the assignability of legal malpractice claims regardless of how the assignment is accomplished. Why isn't that what took place here, simply Ligutti and Ponder trying to make an end run Nevada law? So what happened, Your Honors, is Ligutti and Ponder actually exercised their corporate rights, their membership rights in the LLC prior to any settlement. In 2021-2022, as a result of Get Fresh's breach of the operating agreement, they became the sole owners of Fresh Mix during the pendency of the bankruptcy. But nobody ever declared them such. So that's a... You're saying that we could go back now and look at the operating agreement and make a determination that they should have been recognized as owners during the bankruptcy, but they weren't, in fact, recognized. It's alleged in paragraph 207 of the complaint that they exercised their rights under 8.3 of the operating agreement during the bankruptcy and became the sole owners. How did they exercise their rights? They sent a notice to the other side. They declared Get Fresh in default. They sent a notice, and they sent payment as required under the operating agreement. So I can tell you the trustee did not want to exercise his rights in buying the company, the remaining units of the company, but Mr. Ligutti and Ponder did. I can tell you because I represented the estate. So I was there while this happened, and, in fact, Mr. Ligutti and Mr. Ponder were the remaining owners of Fresh Mix. Now, there's an allegation... You said the trustee didn't want to do what? Own units of Fresh Mix? Because he owned the rights of Fresh Mix already in a bankruptcy. So it's a... Did the trustee bring a malpractice claim? So the trustee attempted to in state court. We were told that it was premature, and so the trustee continued to do discovery in the bankruptcy proceeding, and the bankruptcy proceeding actually resolved with a bad faith dismissal before all the discovery issues were resolved. So the turnover of records required under 7.055 and ethics, 1.16 of ethics, had not been concluded. There were motions to compel pending. The court had already ordered that Fresh Mix was entitled to all of its records. The court had already concluded that, I'll say, the arbitration and state court attorneys had indeed represented Fresh Mix as well as Get Fresh. The state court attorneys opposed those positions. Sorry, can I just interrupt you? It seems like the gist of what you're arguing is that the settlement didn't actually do anything because it was all already done, and that seems a little bit implausible. So what do you think the settlement did, if this is your argument? So what I'll do is let me boil it down a little bit more, Your Honors. I think Nevada state law is best stated as an assignment of a legal malpractice claim to an adversary from the same litigation that gives rise to the malpractice claim, violates public policy. That is the actual Nevada standard. So what we have here is, was there a de facto assignment of rights? We all know and we all agree, Liguti and Ponder were owners of Fresh Mix at all times. Sorry, can I just repeat my question first? Yeah, sorry. I didn't understand your answer to my question. What did the settlement do? Sorry. So the settlement practically confirmed exactly what had happened during the scope of the bankruptcy. So you are saying the settlement did nothing? So the settlement... Well, it could pay $25 million as well. So Liguti and Ponder and Get Fresh, there were some allegations of monies being taken out inappropriately by Get Fresh from Fresh Mix that belonged to Liguti and Ponder. Those elements were resolved. The settlement, as I believe Peace and Knowledge Vice pointed out, the settlement itself, and as Get Fresh pointed out in the settlement agreement, Get Fresh surrendered all right, title and interest to Fresh Mix. By their surrender of their units, whatever they had, whatever it was that was left, which is a factual issue that has to be ferreted out, whatever they had left went back to Fresh Mix. It didn't go to Liguti and Ponder. So the practical is the only remaining owners of the company are Liguti and Ponder. Remember, Get Fresh acted as a creditor to attack its own entity. That was a violation of the operating agreement. So, yes, in a weird way, Your Honor, Liguti and Ponder had acquired whatever rights Get Fresh had during the bankruptcy. Whatever was potentially left, for sake of clarity, let's call it, Get Fresh had to wash its hands of whatever it was touching, that it still touched. We don't know what that is, actually. That hasn't been litigated. But the complaint alleges that Liguti and Ponder acquired Get Fresh's interests as a result of their default under the LLC operating agreement. So I think Oceania is what the district court looked to. The dissent in Oceania appropriately points out, what about corporate formalities? And that's the weird thing in this case, Your Honor, is that the corporate formalities in this case, Get Fresh breached its duties, and it had consequences to it. But the consequences were before the settlement. So can I just ask, though? So I think one of the big policy concerns in these cases about not assigning malpractice claims is that in the negotiation of a settlement, there becomes a conflict of interest between the lawyers representing the one side here, not Liguti, the other side. So all these lawyers representing that side have to suddenly both negotiate for that side and save themselves from this problem. And I don't understand how that policy problem didn't exist in the negotiation of this settlement. That policy is driving this doctrine, I think, and it seems to exist here. But correct me if I'm wrong. So let me take you back to another moment in this case that was pointed out by Brownstein Hyatt. I'm going to take you back to 2019 before the involuntary. And this is at Brownstein Hyatt, BHFS, ER 34. At this time, the lawyers in question have a duty to both Get Fresh and Fresh Mix. I think we agree to that. Joint representation. This is Jim Pisanelli to the entire team at that time. On a very different note, I'm not going to read you the whole thing, but I think it summarizes the problem. The conflict already existed. This duty of loyalty was already breached. So this idea of them being in a conflict because of a settlement, that ship had sailed, Your Honor. On a very different note, I would like us to talk very early next week about the options, including the bankruptcy option. I'm now going to skip. And this is, again, 34. And we need to consider the impact and implicability, if any, of the supermajority consent requirement for extraordinary events. That's the bankruptcy. They needed Mr. Ligutti's approval to put this company into bankruptcy. That's why they brought an involuntary bankruptcy in the guise of creditor. And that fact seems very important to me, because they were not in the bankruptcy operating as the controlling entity of Fresh Mix, but instead as adverse to it. So the controlling Get Fresh was the adversary. And the policy is you can't assign to the adversary. Get Fresh is the adversary, not Fresh Mix, not Ligutti & Ponder. I guess I think this other policy of trying to protect the legal profession from this conflict that happens when you start negotiating this type of settlement, I guess I didn't understand. Your answer was they already had conflicts, and I understand. That's the malpractice claim. But the conflict that is happening when you're negotiating the settlement, I think, is a big part of this doctrine. So it may be boiled down, Your Honor, a little bit more simply, and I apologize. None of these parties to the settlement owned the malpractice claim. The malpractice claim was in the bankruptcy estate. That belonged to Fresh Mix. And the trustee was not a party, any considerations in this case. In fact, the Court on January 12th, after the settlement was done, on January 12th, 2024, says, okay, the estate can pursue this litigation, this malpractice claim, but if I dismiss the case, it's going to go back to Fresh Mix, whomever that is. So the deal was done. The estate that wasn't part of this deal now returns the asset to Fresh Mix, to the only people who were fighting on the same side as Fresh Mix, who were aligned with Fresh Mix. And at that point in time, when this asset is returned, whatever the ownership is of Fresh Mix, it is. There's not an assignment of ownership. So this idea of de facto assignment is what we're looking to, because we know there isn't an assignment of the claim. The claim returns from the bankruptcy estate to Fresh Mix. So the assignment issue is not proper under Nevada law. We have to look to this de facto issue, which Oceania isn't the same fact pattern here at all. And that's probably why it's an unreported decision. But I'd look to the dissent with Tal, where he talks about corporate formalities. And corporate formalities here are very important. Can I step back a minute? Someone along the way raised the question of certifying these questions in Nevada Supreme Court. What is your position on that? I would be fine with that, Your Honors, because I think this is complicated because you have two matters in which the parties are aligned one way. But you didn't seek certification. We did not, because I believe Oceania is very distinguishable. And I think the judge's decision at the district court was incorrect because you have two matters where you can argue adversity, whatever. In fact, the Nevada Supreme Court or even the Nevada Court of Appeals has no presidential decision anywhere in this field of de facto assignments of this nature. So no, because it's about ownership and an ownership fight that occurred within the context of a bankruptcy where one owner acted as a creditor adverse to its own company. Can I say even more broadly? No. More broadly as to this question of attributing what you're calling disregarding the corporate formalities and finding an asset assignment because of a switch in ownership, essentially, of an entity, a switch of shareholders or members rather than of entities. Well, I don't think there is a case on point where one group of shareholders is removed because of their misconduct. Well, even leaving all that, I'm saying even on the broader questions here, like the Oceania kind of situation, there is no Nevada Supreme Court. No, there's no Nevada Supreme Court precedent. The only thing that Nevada was clear about is, again, the assignment of a legal malpractice claim to an adversary. The bankruptcy legal malpractice claim, Fresh Mix, Liguti, and Ponder are aligned. The courts have decided that. The bankruptcy court decided their alignment in the order against Pisanelli Vice for Turnover. And the court said Get Fresh was the adversary. So there's no assignment to Get Fresh. That's the problem. So there's de facto assignment issue. It would be an issue if Get Fresh got rights. So Oceania also was very concerned about the fact, and Duro too, I think, that the parties would have to switch their positions. That's not true here. That is very important, Your Honors. There was no switch in positions. Get Fresh said Fresh Mix was worth zero. Fresh Mix, Liguti, and Ponder said Get Fresh is worth $80 million. So there was no switch in position, so that... But even as to the malpractice issues that would come up, there was no switch. There was no switch in position, Your Honor. That's correct. All right. Your time is expired, so I'll give you two minutes to rebuttal. Thank you, Your Honor. Thank you. Good morning. May it please the Court. Phil Irwin, appearing on behalf of Appellees Pisanelli-Bice, PLLC, James Pisanelli, Deborah Spinelli, and Ava Shaffer. I will also be presenting argument today on behalf of the other appellees in the case who are all represented by counsel here today. I can introduce everybody, but it may be better to just jump into it. I wanted to briefly address before I start my argument a couple of factual representations about what was in the complaint that were just made by my colleague representing Fresh Mix. So it was argued that the malpractice claim only relates to the bankruptcy. In paragraph 283, for example, he expressly pled that the malpractice claim related to commencing an arbitration as well as a number of other acts. So we flatly disagree that only the bankruptcy was at issue in the malpractice claims. Similarly, this notion, and I'll get into this more later in my argument, that the settlement was a formality and didn't accomplish anything because control had been transferred, you know, in 2021 or at some earlier date. At paragraph 263 of the amended complaint, Fresh Mix alleged, quote, GFSI parties settle with Liguti and Ponder, control of Fresh Mix transferred to Liguti. So I just wanted to... So the corporation, in this case Fresh Mix, remains the same entity in name. Correct. So doesn't your case depend on the assumption that Fresh Mix, as reconstituted after the settlement with the change in shareholders, is somehow a legally different entity than it was before? I don't know in the context of de facto assignments in violation of public policy on malpractice claims that it needs to be a reconstituted corporate entity. I think the key is that control of the malpractice claim has transferred to a party that never had the direct relationship with the attorney. Who's the party? Excuse me, Your Honor? To what party has it transferred? So, in this case, which is very similar to the Duro Incorporated v. Rodino matters out of the Northern District of Indiana and the Seventh Circuit, control here in the settlement transferred from Get Fresh Sales Incorporated, which I'll refer to as GFSI, and it transferred to Mr. Liguti and Mr. Ponder, who were previously minority shareholders. That does require disregarding the corporate entities.  But I think the... That's what's peculiar about this. I mean, we spend so much time respecting the separateness of the corporate entities, and this whole doctrine, as the dissenter in Oceana pointed out, completely disregards that. So it's a little bit of a wrench in terms of the way lawyers usually think about corporate entities. It may be, Your Honor, but I think the public policy concerns are the most important here, and those reasons trump the corporate formalities, which is why the majority in the Oceana... So what about certifying this to Nevada Supreme Court and see which they care about more? Well, I think Nevada law, and frankly, the law in this area across the country is uniform. Nevada has an absolute prohibition against the assignment of legal malpractice claims. But there is no Nevada Supreme Court case about the notion that you are transferring, that you are assigning a claim when it's a single entity that has the claim because the ownership's changed. There is not. And how far that reaches. I mean, obviously, I mean, these are very small entities, and it's possible you could even pierce the corporate veil. We don't know. But if you had a, you know, if you had Paramount and CBS, and they had a malpractice claim and they changed ownership, does the malpractice claim disappear at that point? Well, on the question of certifying the question to the Nevada Supreme Court, I would note that the Nevada Supreme Court declined to review the Oceania decision. There was a petition to have that heard by the higher court. And they did not do that. I also think Nevada law is in accord with other states' law, and I'd again point to the Duro v. Rodino decision because those courts relied on the Piccadilly decision from the Indiana Supreme Court, which Nevada has also looked to. The Nevada Supreme Court looked to that in Beaver v. Tomcheck. So is there any evidence in the record that any of the parties used the legal malpractice claims as a bargaining chip during their settlement agreements? No, and we don't know anything about the settlement agreement. We've never even seen it. We only know what Fresh Mix alleged, and it very clearly alleged a de facto assignment. But as far as whether or not it was a collusive settlement, I think the Nevada Supreme Court Collusive was whom? Excuse me? Collusive was whom? Was Get Fresh? Our position, Your Honor, is that it doesn't need to be a collusive settlement for this doctrine to apply. If you look at footnote 4 of the Oceania decision, as well as the Beaver v. Tomcheck decision, the specific facts, and this goes to distinguishing the case law, are not as relevant as the policy considerations. And in footnote 4 of the Oceania decision, the majority took issue with the dissent of There's a counter policy decision, Your Honor, which is a malpractice claim which rests on a conflict of interest contentions, and which was being pursued, or you can tell me whether that's true or not, or at least was considered to be pursued by the trustee in bankruptcy on behalf of the same corporation, is now up in smoke. Nobody will ever be able to assert it. Is that right? That's correct, Your Honor. And as far as the conflict of interest, I'm like a broken record, but I would, again, look to the Duro case, which had almost identical facts with the minority and majority shareholders. There was also multiple, you know, motions to disqualify claiming a conflict of interest. What's strange about this case is that the majority shareholder, with regard to the bankruptcy, was adverse to its own subsidiary, if you call it a subsidiary, because it was treating the – it brought an – if it had brought a voluntary bankruptcy, it would have been a different story. But it brought an involuntary bankruptcy purporting to be a creditor of its own subentity. And so collusion under those circumstances seems extremely far-fetched. And the fact that the entity, in the guise of the bankruptcy of state, was pursuing the malpractice suggests that it has independent merit, and it only went away because the bankruptcy was an invalid bankruptcy. If it had been an – according to the bankruptcy judge, the bankruptcy judge dismissed it as an improper bankruptcy. If it had continued as a bankruptcy, the malpractice claims would have continued. Potentially, Your Honor, the trustee never filed malpractice claims. No, but he was trying to, as I understand it. I think – So would adopting your position mean that courts would have to sort out all of the various percentages of shareholder interest in every case like this one in order to apply the rule prohibiting assignments of legal malpractice claims? I don't know that that – it doesn't seem like a workable practice. Wouldn't a formal rule that doesn't require courts to look under the corporate hood be more easier to administer? I don't think so, Your Honor. And I think that's borne out by the case law in this area, not just in the Oceania and Indiana, but you also have the Kenco decisions out of Washington, decisions out of Oklahoma and Kentucky, where the law is uniform. And these types of de facto assignments have been done through a federal court order transferring control or transferring that equity or selling or gifting the adverse party 50 percent so they can pursue the claims. Regardless of the specific facts, I think courts have been able to kind of see through this. And in this particular case, it's right in the amended complaint. I mean, Fresh Mix made it very clear that the settlement agreement, which resolved the claims between the adversaries, transferred control from the majority shareholders to the minority shareholders. There was a waiver of attorney-client privilege, which again is a hallmark of a de facto assignment in violation of public policy. Sorry, could you say that again? I missed the beginning of that. Last sentence. The GFSI waived privilege in the settlement agreement, which these courts, Nevada Supreme Court, or not the Nevada Supreme Court, the Seventh Circuit, Indiana, these other decisions have all found that that is a hallmark of a de facto assignment against public policy. So, all of these allegations are expressed in the face of the amended complaint. So, for Fresh Mix to come in here and say, oh, it transferred earlier because we sent this notice, or it happened, you know, as a result of the bankruptcy, I don't think Fresh Mix can make those arguments because it has binding judicial admissions in its complaint about the effect of the settlement agreement. Under that law, as I understand it, it's not just legal malpractice claims that aren't assignable. Personal injury claims in general aren't assignable. So, does this become now a rule about any personal injury claim? Well, I think it's limited to the facts of the case, and this is legal malpractice, and Nevada law is absolute here. There are no exceptions to Nevada law in this area, and it doesn't matter, you know, what the specific facts of the case are. You cannot assign a legal malpractice claim for a number of policy reasons. And it's not related to the specific facts of whether those policy concerns are present. It is the risk. If the Court looks at Beaver v. Tomchak, the Nevada Supreme Court used it. Well, that makes sense. Yes, of course. But as to the question of whether that principle applies under these circumstances, you would think you would go back to the policy considerations. In other words, the circumstances here are not an assignment. They're an asserted de facto assignment accomplished through the change of ownership of an extant entity, which apparently had reason to be considering and was considering the malpractice claims beforehand. I gather also that this rule about not transferring claims is not obviously applicable to claims that already exist. It has to be incipient claims. Is that right? Claims that already... In other words, if the case is already in court, it's not clear how Nevada law treats those. If the claims had already been filed and then control of the company transfers, I have not seen a case like that, Your Honor. What I have seen, though, is that every court that has addressed these de facto assignments has come down one way. And I have also seen FreshMix not cite a single case in support of its position. Judge Berzani, you pointed out earlier you can distinguish the facts of just about any case, but you get a lot more mileage distinguishing facts when you're pointing at something that helps your position. Here, all FreshMix has done is distinguish cases not just from the Nevada Court of Appeals, but from several other states and a sister circuit of this court, all coming down in the exact same place, which is if there is a de facto control where the control of the entity holding the claims transfers, then that's an invalid assignment in violation of public policy. And there's just no dispute under the law there. Do you regard that rule as at least limited to circumstances in which the adversaries were – the parties were adversaries to each other so that you wouldn't start applying it in the context that I was suggesting before? I think the adversarial nature is a critical feature of this assignment, but what I would point to – It's not a critical feature of the rule about assignments in general. That's right, Your Honor, and that's where I was going because the Seventh Circuit pointed that out of – in response to the exact same argument of, oh, we were always fighting on – the minority shareholder was always fighting for the company so there was no conflict. The Seventh Circuit said that that stretches it way too far. And even if that were true, that there were no adversarial relationship, the rule against the assignment of malpractice claims is absolute. So I don't know that – So that means that you're not limiting this de facto rule to circumstances in which there was an adversarial relationship. So that becomes a – if we at least limit it – regarded it as limited to those circumstances, at least we have a box into which this fits. Otherwise, it seems to become extremely broad. Well, I think the facts – Because corporate controls switch all the time. Your Honor, that's not me saying that. That is the Seventh Circuit Court of Appeals addressing the same Indiana law that the Nevada Supreme Court has looked to. All right, but I'm asking you what we should rule if we're going to rule on this. I think this is a motion to dismiss. I think the court is limited to – there's a lot of extraneous stuff that got put into the record, including the email that got read earlier in the argument. But I think the court is limited to the allegations in the amended complaint, which are abundantly clear that this settlement agreement was designed to accomplish a de facto assignment in violation of public policy where the former lawyers, the adversaries of Mr. Liguti and Ponder, are carved out from their releases. There is a waiver of privilege. All of the hallmarks. Can I just ask – so it seems like the complaint basically incorporates, by reference, this settlement agreement. But I think you said earlier you've never seen it. Why don't we have the settlement agreement? It's never been produced to us. The case never went to discovery. But my clients as well as the other lawyers weren't in the room when this deal got hashed out. So to the point of whether there was a collusive settlement or not, I don't believe that matters to find a de facto assignment in violation of public policy. But we don't know. So we don't have that information. We've never seen the settlement agreement. The clients negotiated this by themselves without the lawyers? I was asking a question earlier. I thought the lawyers would sort of be in this weird position of having to negotiate for the client and against themselves. But you're saying the lawyers didn't negotiate. Separate counsel. But my clients were out by the time this agreement was reached. But all we are relying on is the allegations and the amended complaint, which kind of rendered that discovery unnecessary because, you know, the Ninth Circuit has said you can plead yourself out of a claim. And Fresh Mix has pled every fact you need and every hallmark of a de facto assignment in violation policy. It is in the 100-page complaint. We know exactly what the settlement agreement did. And I don't see any other conclusion that it was transparently orchestrated to accomplish what the law prohibits. I know I'm out of time, Your Honor. If the panel has any other questions, I'm happy to answer those. I don't think we do. Thank you. Thank you. Thank you, Your Honors. So what I'll note is that my colleague, Mr. Irwin, had mentioned the Duro case. And once again, the public policy in the Duro case, the overarching public policy, is a duty of loyalty. So that's the public policy we're seeking to address. Now, the letter that I read from, the e-mail that I read from, it wasn't put into the record by me. It was put into the record by appellate counsel. By appellate counsel. Not Mr. Irwin, though. Another counsel. It's a motion to dismiss, so how is it put into the record at all? Hmm? If this is a motion to dismiss, how is it in the record at all? It was part of the motion practice. It was attached to various motions as additional exhibits for the court to take into account. On a motion to dismiss? On a motion to dismiss, Your Honor, yes. There were various exhibits added to the motion to dismiss with the idea that, look, if you're going to dismiss it, let us amend as well. So don't dismiss. You need us to correct things. Here's some reasons why we'll amend. So we have counsel that said the prolux complaint. Wait, your side would have been the side amending. Correct, correct. So you would usually be the one saying, here's what I would amend with. You're saying they are the ones who gave that, though? They put it in response to the motion. They put it into this record, Your Honors. The underlying record, it wasn't part of the complaint. So we didn't add it to this record. The appellate added it to the record. So they're allowed to. They chose to. I didn't make that decision. But that letter that I referenced goes in and talks about the systematic decisioning that's happening with counsel to drive Freshman's value to zero for the benefit of Get Fresh. That's planning against the client. That's the malpractice claim. It's not responsive to the question of whether there was an assignment here. Sorry, Your Honor, I did not hear that. That suggests that you have a quite possibly valid underlying malpractice claim. But what does that have to do with the assignment question? So, Your Honor, it doesn't have to do with the assignment question, but it has to do with the public policies of duty of loyalty. You can't claim there's an assignment that caused us to be — that would cause a disloyalty issue or a loyalty issue when you were already disloyal to that client. You helped a creditor and an owner put that client into an involuntary bankruptcy. You weren't loyal to Fresh Mix. They can't claim we're protecting the professionalism of the law practice when you already breached professionalism. So the rule, which Duro does not seem to recognize that, when the malpractice claim is based on a conflict of interest or disloyalty, then the assignment rule doesn't apply, or what? Well, there isn't an assignment here. So that's sort of the problem. No, so that's the question.  But so I don't see the pertinence of what you're saying. I mean, it might not be a bad rule that says when there is no loyalty, when the claim is lack of loyalty, the assignment rule doesn't apply. But you're not arguing for that. You're arguing that this isn't an assignment. Correct. There's no de facto assignment. And I think Judge Callahan pointed it out. What percentages do we use? When do we do that? There's some times where let the fact finder hear the case, try the case. When there wasn't an assignment, acknowledge corporate formalities, let them stand, and let the trier of fact decide ultimately what happened here. Rather than putting in this rule in Oceani, it can get expanded dramatically. I'm going to ask you to wrap up. Sorry. Now you've gone into overtime. I'm sorry, Your Honor. One of the critical evaluations, look at all of the Nevada law, and you'll find it's a transfer to a creditor. That has always happened. That's been the issue. Not that a majority has been found to do something wrong, knowingly wrong, with the aid of attorneys. It's always a transfer to a creditor. There's no transfer to a creditor. There's no de facto transfer to a creditor. That didn't happen here. In fact, Get Fresh was the creditor. LaGuardia and Ponder were owners left in charge because of the other creditor owner's malfeasance, but the attorneys owed a duty of loyalty to Fresh Mix. That's the duty of loyalty. Thank you, Your Honor. Thank you for your argument in this matter, and this stand submitted in this court is in recess until tomorrow at 9.
judges: BERZON, CALLAHAN, FRIEDLAND